mortgages so executed being valid would be wiped out at one swoop.

[5] On the first hearing of this case, it appeared to two of the members of the court that, inasmuch as the plaintiff bank was suing on the note as being secured by vendor's privilege, it could not be allowed to contend that the obligation had not originally had for its consideration the purchase price of the property. In so viewing the matter, the important fact was lost sight of, that, as against the defendant, White, who in negotiating the note had represented it to be a vendor's note, the allegation of the note having this character was perfectly legitimate; and that it was only as against him that the note was thus being sued on. An allegation thus made in another suit and as against another party (and especially one thus legitimate when and where made) cannot operate as a judicial estoppel. Farley v. Frost-Johnson Lumber Co., 133 La. 504, 63 South. 122, L. R. A. 1915A, 200, Ann. Cas. 1915C, 717; Coleman v. Jones & Pickett, 131 La. 803, 60 South. 243; Davis v. Welch, 128 La. 785, 55 South. 372.

The judgment dissolving the injunction is affirmed, with costs.

MONROE, C. J., recused.

========

(81 South. 757)

No. 21760.

WILKINS v. WASHINGTON OIL CO., Limited.

(May 5, 1919.)

*(Syllabus by the Court.)*

APPEAL AND ERROR ⚫⟲1152—AMENDMENT OF JUDGMENT — NONSUIT INSTEAD OF DISMISSAL.

Where the interests of justice require it, a judgment of dismissal will be converted into one of nonsuit.

Appeal from Sixteenth Judicial District Court, Parish of St. Landry; B. H. Pavy, Judge.

Action by Daniel Wilkins against the Washington Oil Company, Limited. Judgment for defendant, dismissing the action, and plaintiff appeals. Judgment amended, by adding the words "as a case of nonsuit," and affirmed.

Garland & Harry, of Opelousas, for appellant.

Harvey E. Ellis and Walter A. White, both of Covington, for appellee.

Statement of the Case.

MONROE, C. J. This is an appeal by plaintiff from a judgment rejecting his demand for damages for personal injuries sustained while working in defendant's cotton seed oil mill. It appears that he was employed in the "screen room," and that his duties were to clean up and to carry out the dirt, to see that the conveyer did not get choked, or clean it out when it did, to replace the belt by which the conveyer was operated, when it came off the pulley, and to notify the foreman in the event of a break either in the belt or the machinery.

The belt in question was a light one, measuring only four inches in width, and when it slipped off the pulley, as it frequently did, particularly when green seed was being crushed, it was to be replaced by hand, which required the person replacing it to get upon an elevation, whence he could reach the upper (driving) pulley. It is shown that there was in the room a stepladder which might have been used for that purpose, and several of defendant's witnesses testify that it would have been safer to have used it than the top of the conveyer, which was being used by plaintiff at the time of the accident. Plaintiff had, however, worked in the same room during two preceding seasons, and was in his third season when the accident occurred, and he had never been instructed to use the ladder, nor had it ever been used in replacing the conveyer

belt. On the night of the accident the belt came off quite frequently, and, in plaintiff's opinion, had grown slack and loose, and required relacing, and he twice requested the foreman to attend to it; but the foreman was otherwise engaged and did not comply with his requests. Upon a third call, however, the foreman accompanied him to the screen room, but seems to have concluded that the slipping off of the belt was caused by the choking of the conveyer with green seed, or, as his testimony suggests, he was so much concerned about keeping the conveyer "a-going," that he preferred to go on with the loose belt rather than stop and relace it. His testimony as to the circumstances which preceded and were immediately connected with the accident is to the effect that plaintiff twice called him to come and relace the belt, and that he was too busy to go; that he finally went to the screen room, after a third call, and, as to what then occurred, as follows:

"Old man Dan [plaintiff] was there, and I told him to let's hurrah and get things started before I ran out of meal. The mill was supposed to go; if he had gotten killed, we would have laid him aside and let the mill go. We are employed to see that the mill goes. Q. Where were you when he got hurt? A. I was there. Q. You came and found the conveyer choked up? A. Yes; and we got in there and cleaned it out with our hands. Q. After you had cleaned it out with your hands and unchoked it, what about the belt? A. Old man Dan was standing there, and I said, 'Are you going to get it?' and he said, 'Yes,' and he stepped right between two posts and put the belt on the upper pulley. Q. Were you on top of the conveyer at that time? A. No, sir; I was on the floor, and he was up there. Q. How came he to get up there? A. He was already up there. * * * Q. Did you see him put the belt on? A. After he put the belt on, it ran all right, and then it ran off again, and I said, 'We will see what is the matter with it,' and I reached up there and pulled the seed out of the head. He was already up there, and he put it on, and, as he turned himself around, it was done so quick, it looked like it was a fan that just brought him through. Q. Wasn't the belt very loose? A. No, sir; the belt was in good condition. The only thing that

145 LA.—3

threw the belt off was the green seed. Q. Didn't you say the belt was put on, and, as soon as the feed ran out, it ran off again? A. Yes, sir; about half off, and that is what caused Dan to get caught. Q. When that belt ran off the drive pulley at the time that Dan got hurt, did it run off on the side he was hurt on, or the opposite side? A. On the side that he was hurt on; if it had been on the opposite side it would not have hurt him. * * * Q. Thereafter, did you have to change, alter, or modify that belt in any manner during the season? A. No, sir; I didn't; I don't think anybody else did."

Being asked whether the belt could hurt any one by falling off on the shaft, he answered and further testified as follows:

"A. It didn't seem to me so; but it ran into him some way. Q. The only danger, then, as I understand, was when a person attempted to put the belt back on the pulley; is that it? A. The only way that I could see, by Dan standing in front of me, it seems to me that when the belt ran off the pulley was when he got hurt; that is the only way I could see. Q. How could it have hurt him? A. If it had caught him, it certainly would have hurt him. It might have pulled him off; by turning around—not noticing the belt—it might have hurt him. Q. Were you looking up at Dan the time he got hurt? A. First, I was noticing him, and then the end of the conveyer. Q. After he put the belt on, what did he do? A. He turned around to come down; that was the only way I could see. Q. And then it was he got hurt? A. Yes; it seemed to me it just snatched him and made him face the pulley again. Q. But he had turned around before he got hurt? A. In turning around to come down, he got hurt."

Mr. Moffet, defendant's superintendent, testifies that the belt was in good order at the time of the accident, and that nothing, in the way of changes or repairs, was done to it during the season. We find no specific statement to the effect that the same belt was continued in use, though that may perhaps be inferred from the testimony.

Plaintiff's version of what occurred is as follows:

"He told me to get up there and put it on again, and I did so; but it wouldn't stay on, and I pressed down on top, and the lacing of the belt struck my hand and threw it on the pulley. * * * Q. What did you stand on while fixing the belt? A. On the conveyer where the seed comes down through the auger. * * * Q. Did I understand you to say that you made complaint to the belt foreman of the condition of the belt—how many times? A. About three times. Q. What did you want him to do? A. I wanted him to come and tighten the belt or do something. Q. Relace or tighten it? A. Yes, sir; because, the condition it was in, you couldn't do anything with it. Q. What reason did the belt foreman give you for not stopping and relacing or tightening the belt? A. Not any; he just told me to get up there and put it on, and that is the time it caught my hand. * * * Q. Did he say the reason why he didn't want to stop the mill? A. He just said he wanted to get ahead in meal—we were behind in meal—so I told him he had better fix it at once, and then the belt would be in order, and then, if he didn't, the press room and all would have to stop. * * * Q. Did he promise to fix this belt after the meal was provided for? A. He told me to go up there and try it, and I did so; and he said, if it wasn't right, he would fix and tighten it, and then is when I got caught. Q. The reason he didn't fix it when you asked him was because he wanted more meal? A. Yes, sir. * * * Q. You say that the belt was very loose on the pulley? A. Yes, sir; it kept wobbling, and then, when we put in feed, it wouldn't pull no feed at all; she would run off. * * * Q. Do you know exactly how your arm got caught in that pulley? A. I was putting the belt on, and the lacing caught my hand and threw it on the pulley. * * * He told me to get up there and put it on again, and I did so, and I pressed down on top, and the lacing of the belt struck my hand and threw it on the pulley."

Plaintiff is shown to have been about 60 years of age and to have had one of his arms so broken in the accident in question that not only is it not likely to be of any service to him in the future, but promises to be, and up to the time of the trial had been, a hindrance. He was not even able to use a broom, sweeping with it, because of its injured nerves. Defendant gave him $10 and paid his doctor's bill of $25; but he is left utterly destitute and without the ability to help himself.

## Opinion.

This case presents rather peculiar features. The accident occurred on September 9, 1914. The Burke Roberts Employers' Liability Act (No. 20, p. 44, of 1914) had been promulgated on June 24, 1914. The suit was instituted in February, 1915, and the answer filed in April following; but the Employers' Liability Act has not been referred to either in the pleadings or the briefs. Counsel for defendant have filed two briefs, bristling with authorities in support of the defenses of assumption of risk and contributory negligence. No brief has been filed by plaintiff's counsel, nor was the case argued orally. Counsel for defendant, in one of their briefs, say that there were two ways of doing the work in which plaintiff was engaged when injured, the one, by standing on the conveyer, and the other, by using the ladder, and "while either way was safe, if the man doing the work used ordinary precaution, the safest way was by using the ladder."

Defendant's foreman, being the only person besides plaintiff who was present when the accident occurred, testifies that, after plaintiff had replaced the belt, he turned around to come down, and that it seemed to him that the belt, which had again slipped off the pulley, "just snatched him and made him face the pulley again," and that it was then that he was hurt. Again, he says:

"It seems to me, when the belt ran off the pulley was when he got hurt. * * * If it had caught him, it certainly would have hurt him."

Other of defendant's witnesses (who were not there) testify that no one could be hurt by the slipping off of the belt; that it would merely fall on the shaft. If, however, the foreman, who was there, be correct in his idea of the manner in which the accident occurred, then the conveyer was not a safe place from which to replace a pulley that was constantly slipping off, and the only

safe place would appear to have been the ladder.

Plaintiff testifies, however, that the ladder never was used, and it is not shown that he was ever instructed to use it. Moreover, upon the occasion of the accident, we think, comparing the testimony of the plaintiff with that of the foreman under whose orders he was working, the foreman specifically instructed him to go up on the conveyer and replace the belt; so that, if there was negligence in the matter of his using the conveyer, it was the negligence of the defendant, acting through its foreman. The plaintiff, as we have stated, testifies that the belt was loose and wobbly, and, notwithstanding that the preponderance of the testimony is against him on that point, we have no doubt that he earnestly believed that it was wobbly, or he would not have called upon the foreman three times in the course of the night to come and relace it. Moreover, as defendant has taken some pains to prove, plaintiff was in his third season's experience in dealing with that belt, or one like it, and we can see no reason to doubt his ability to distinguish between a belt that slipped off the upper (driving) pulley because it was loose and one that was thrown off by the choking of the conveyer and the consequent stopping of the lower pulley. The foreman virtually confesses that he did not want, and did not intend, at that time, to find a belt that required lacing and the consequent stopping of the conveyer. He says that, when he finally went to the screen room, in response to plaintiff's third call, to come and relace the belt, "Old man Dan was there," and, as his answer to that call, "I told him to let's hurrah and get things started before I ran out of meal. The mill was supposed to go. We are employed to see that the mill goes." And so he sent the "old man" up on the conveyer to replace the belt, which having been done, he saw the belt again slip off (though there was then no congestion in the conveyer), and, as it seemed to him, it "just snatched" the old man, and turned him around, and it was then that he got hurt. The case, then, in our opinion, would be a plain one for the plaintiff, were it not that he testifies that the accident was brought about by reason of the fact that, in order to keep the belt from again slipping off, "he pressed down on the top and the lacing of the belt struck my [his] hand and threw it on the pulley." The learned counsel for defendant do not seem to understand that statement. They say in their brief:

"Plaintiff says that his hand was caught in the lacing of the belt. The only other witness offered by the plaintiff, Gus Prudhomme, says that he examined the belt lacing after the accident and that it was in good condition."

But the plaintiff does not mean, as we think, that his hand was caught in the lacing of the belt, and no one says that the lacing was not in good condition. The lacing was knotted on the outside of the belt, and perhaps properly knotted, and when plaintiff put his hand upon the outside of the then rapidly moving belt, in order to press it down and keep it from slipping off, the knot came in contact with it, or, as he says, "struck my [his] hand and threw it on the pulley," which appears to us to be an intelligent statement. Ordinarily speaking, it would appear to be an act of negligence for a man to undertake to hold a belt down upon a moving pulley with his hand upon the outer surface; but allowance, we think, should be made for an old laborer, who, working upon a 12-hour night shift, from 6 in the evening to 6 in the morning, is called upon, at 4 o'clock in the morning, to "let's hurrah and get things started before I run out of meal," etc., and who, as we infer, is given to understand that a belt is not to be laced, but, wobbly or otherwise, is to be replaced on the pulleys, and kept there.

In view of the disposition that was made

of the case by the learned trial judge, and of the conditions under which it has been presented to this court, whilst we do not feel that we should be justified in converting the judgment appealed from into a judgment in favor of plaintiff, we think the interests of justice require that he should be afforded an opportunity to be heard again, and that the judgment herein should be one of nonsuit.

It is therefore ordered that the judgment herein appealed from, decreeing that the plaintiff's suit "be and the same is hereby dismissed at his costs," be amended by adding thereto the words "as in case of nonsuit," and, as thus amended, affirmed; the costs of the appeal to be paid by plaintiff.